IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LINDA CRAIG**, as parent and
next friend of **C.M.**, a minor,

       Plaintiff,

      vs.                        No.   **CIV 06-988 MCA/LFG**

**BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY; BOARD OF
COUNTY COMMISSIONERS OF TORRANCE
COUNTY; BOARD OF COUNTY COMMISSIONERS
OF VALENCIA COUNTY; BOARD OF THE
VALENCIA COUNTY REGIONAL JUVENILE
DETENTION CENTER; TOM SWISSTACK,**
in his individual and official capacity as an employee
of the Bernalillo County Juvenile Detention Center;
**VERONICA TRUJILLO**, in her official and personal
capacity as an employee of the Valencia County
Regional Detention Center; **JOHN DOE I**, an
employee of the Valencia County Regional
Juvenile Detention Center,

       Defendants.

## MEMORANDUM OPINION AND ORDER

    **THIS MATTER** comes before the Court on ***Defendant's Motion for Summary Judgment*** [Doc. 50] filed on October 16, 2007.  Having reviewed the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion with respect to all of Plaintiff's federal claims and declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.  Accordingly, Plaintiff's federal

claims are dismissed with prejudice and the remaining state-law claims in this action are remanded to the Second Judicial District Court for the County of Bernalillo, State of New Mexico.

## I.    **BACKGROUND**

On June 26, 2006, Plaintiff Linda Craig filed this civil action on behalf of her minor child, C.M., seeking damages from Defendants for alleged negligence and violations of C.M.'s constitutional rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  The alleged negligence and civil-rights violations arise from the circumstances of C.M.'s pretrial detention at the Valencia County Regional Juvenile Detention Center (VCRJDC) in Los Lunas, New Mexico, from June 26, 2004, until July 1, 2004, and his subsequent detention at the Bernalillo County Juvenile Detention Center (BCJDC) from July 1, 2004, until his release on July 16, 2004.  During his stay at the VCRJDC, C.M. allegedly was subjected to sexual assaults and bullying by another juvenile, L.H., who was assigned to the same room.

At that time, Defendants Board of County Commissioners of Bernalillo County and Board of County Commissioners of Valencia County were parties to a Joint Powers Agreement (JPA), under which the VCRJDC was managed by Bernalillo County.  The JPA also established the Board of the Valencia County Regional Juvenile Detention Center, which contains members from both counties.  Defendant Tom Swisstack was the Director responsible for the management of both the Bernalillo County and Valencia County juvenile detention facilities.  [Ex. E to Doc. 51-2; Swisstack Dep. at 6.]  Defendant Veronica Trujillo

-2-

was employed as a part-time social worker at the VCRJDC during the relevant time period. [Trujillo Dep. at 7-8.]   Employees of Defendant Board of County Commissioners of Torrance County were responsible for transporting C.M. to the detention facilities following his arrest, as well as transporting him to and from his court appearances.   [C.M. Dep. at 26-27; Norris Dep. at 33.]

After being served with the *Summons* and *Complaint* on or about September 21, 2006, Defendant Board of County Commissioners of Bernalillo County filed a *Notice of Removal* [Doc. 1] in the United States District Court for the District of New Mexico on October 12, 2006.  With the exception of Defendant John Doe I, all other Defendants were served and answered Plaintiff's *Complaint*.   [Doc. 2, 5, 6, 7, 10, 13, 22.]

The assigned Magistrate Judge unsealed the pleadings [Doc. 15] and issued a *Scheduling Order* [Doc. 18] setting pretrial deadlines, including an expert-disclosure deadline of July 16, 2007, and a motions deadline of October 16, 2007.  Plaintiff did not identify any experts by the expert-disclosure deadline [Doc. 29], nor did Plaintiff ever move to amend her pleading to identify and serve any "John Doe" Defendants.

On the deadline of October 16, 2007, Defendants filed their *Motion for Summary Judgment* [Doc. 50].  The undisputed facts and evidence of record pertaining to this motion can be summarized as follows.

On June 26, 2004, Plaintiff's 13 year-old minor child, C.M., was arrested by deputies from the Torrance County Sheriff's Department and charged with Aggravated Assault on a Household Member following an incident in which C.M. allegedly threatened Plaintiff Linda

Craig with a knife. [Ex. A to Doc. 51-2.] After his arrest, the deputies initially took C.M. to the BCJDC for intake purposes, and then he was transported to the VCRJDC. [Ex. I to Doc. 51-3; C.M. Dep. at 36-41.]

The parties dispute the quality or appropriateness of the screening, classification, and orientation that C.M. received upon his arrival at the juvenile detention facilities. Nevertheless, the evidence of record indicates that C.M. received some type of medical intake screening upon his arrival at the BCJDC and was questioned about his medications. [C.M. Dep. at 38-41.] The evidence of record further indicates that Defendants' classification procedure evaluated C.M.'s potential for violence, escape, and suicide, and that C.M. was classified as having a relatively high risk for violence and escape, in part because of the pending charge against him (aggravated assault on a household member involving a knife). [C. Norris Dep. at 22-30; Ex. I to Doc. 51-3.]

Finally, it is undisputed that detainees went through an orientation process at VCRJDC that included review of an orientation handbook and a written quiz. The information distributed during this orientation included procedures for filing a grievance and requesting access to a nurse and social worker. [C. Norris Dep. at 27, 36-38; C.M. Dep. at 45.] Plaintiff has presented no expert testimony to establish that C.M. has a particular disability or to explain the standards by which such disability should have been assessed during the screening, classification, and orientation process described above.

After the screening, classification, and orientation procedures were completed, C.M. was placed under the direct supervision of the Youth Program Officers (YPOs) who staffed

his unit at the VCRJDC. The YPOs were then responsible, at least initially, for making room assignments for each detainee in their care. The criteria for making these assignments included "match[ing] kids up so that there's an equity in either physical or emotional strength." [Norris Dep. at 82-83.] In addition, detainees who were accused or convicted of sex offenses would be classified as "room alone/shower alone," and therefore were not assigned to the same room as another detainee. [Norris Dep. at 75-76.]

Under this system, the VCRJDC staff initially assigned C.M. to share a room with L.H., another detainee who was 13 years old, stood five feet five inches tall, and weighed 100 pounds at that time. C.M. had a similar stature of five feet six inches tall and 150 pounds. While L.H. was facing charges that involved violence and shared C.M.'s classification in terms of risk for violence and escape, L.H. had no prior history or pending charges involving sex offenses or sexual misconduct at the time he was assigned to room with C.M. [Ex. I to Doc. 51-3; Norris Dep. at 63, 84-85; Garcia Aff. ¶ 15.]

L.H. and C.M. were assigned to the same room from the time C.M. completed his intake and orientation at the VCRJDC on June 27, 2004, until June 30, 2004. The shared room assignment meant that L.H. and C.M. were in a locked cell together, with no one else present in that cell, for thirty minutes at a time during VCRJDC's shift changes and during sleeping hours at night. The VCRJDC staff was responsible for performing room checks every fifteen minutes during the shift changes and periodically during sleeping hours. [Norris Dep. at 6, 48-56.]

While L.H. and C.M. were in their room together from June 27, 2004, until June 30, 2004, L.H. allegedly assaulted C.M. in various ways, including:  (1) placing C.M. in a headlock; (2) running his hands down C.M.'s legs without his permission and while stating: "Are you my bitch?"; (3) trying to take C.M.'s shirt off; (4) spitting in C.M.'s face; (5) trying to "hump" C.M.; (6) pinning C.M. against the wall; (7) partially disrobing and exposing his penis to C.M.; (8) pressure-pointing C.M. in the neck; and (9) threatening to kill C.M. if he told anyone.  C.M. actively resisted these assaults and was able to fight off L.H.'s advances or get him to temporarily discontinue his attacks, such that L.H. never made skin-to-skin contact with C.M.'s private areas, and no lasting physical injuries resulted.  [C.M. Dep. at 66-70, 76-77, 91-93, 99-104, 114-20, and Ex. B.]  There is no evidence that L.H. engaged in any of the above behavior while the two juveniles were outside of their shared room in the VCRJDC's common areas (such as showers or bathrooms).  [C.M. Dep. at 76, 82.]

The parties sharply dispute the timing and extent of C.M.'s disclosure of L.H.'s assaults to the VCRJDC staff and sheriff's deputies.  Plaintiff points to deposition testimony in which C.M. claims that he told Torrance County Deputy Buck Councilman that he "felt as if my roommate was trying to rape me."  [C.M. Dep. at 112.]  C.M. allegedly made this statement on the afternoon of June 29, 2004, as Deputy Councilman was transporting C.M. from a court hearing to the VCRJDC.  Defendants point to contrary testimony earlier in C.M.'s deposition, at which time C.M. stated that during the courthouse trip he only told Deputy Councilman that he was being "bullied" by his roommate.  [C.M. Dep. at 84-85.]  Defendants also note that during his court appearance on June 29, 2004, C.M. had the

opportunity to report his problems with L.H. to his counsel, his probation officer, or the presiding judge but declined to do so.  [C.M. Dep. at 84-85.]

In any event, the evidence of record indicates that Deputy Councilman spoke with YPO Danny Garcia upon his arrival at the VCRJDC immediately following the courthouse trip, and YPO Garcia subsequently questioned both C.M. and L.H. about the circumstances of their shared room assignment.  [Garcia Aff. ¶¶ 4-6; C.M. Dep. at 85-88.]  YPO Garcia claims that in response to such questioning, C.M. never mentioned "a sexual assault or problems of a sexual nature," and L.H. adamantly denied bullying C.M.  [Garcia Aff. ¶¶ 7-10.]  In his deposition testimony, C.M. also admits that he did not detail what the issues were with respect to L.H. during his conversation with the YPO.  [C.M. Dep. at 87-88.]  Nevertheless, YPO Garcia cautioned L.H. that "any bullying of his roommate would not be tolerated and would result in punishment."  [Garcia Aff. ¶¶ 11-12.]  In addition, YPO Garcia asked C.M. if he would like another room by himself the next time a vacant room becomes available, and C.M. responded that he would like to have a room by himself.  [C.M. Dep. at 86-87.]

On the evening of June 29, 2004, however, a vacant room was not available, and creating such a vacancy would have entailed changing the room assignments for other detainees.  [C. Norris Dep. at 62-63.]  Thus, C.M. had to endure another night of sharing a room with L.H.

On June 30, 2004, it is undisputed that C.M. reported more details which revealed that L.H.'s continued bullying involved one or more sexual assaults.  There are several variations

in C.M.'s account of how he reported this information and came to be placed in a different room by himself.  At one point in his deposition, C.M. testified that L.H. had him pinned next to the door of their shared room during the afternoon shift change, when one of the staff walking by saw what was going on, pulled him out, and began to inquire about the situation.  [C.M. Dep. at 88.]  C.M. refers to that incident as occurring on the "fourth day" of his detention, but later testifies that he had already been put in a separate room by himself "on the night of the third day."  [C.M. Dep. at 88, 104.]  The latter testimony conflicts with C.M.'s statement that he was still fighting off L.H. in their shared room on the evening of the third day.  [C.M. Dep. at 99-102.]

In his deposition testimony, C.M. also recalls speaking to a counselor after he had been placed in a separate room on the evening of his third day of detention, but later indicates that he spoke to the counselor *before* he was placed in a "different room" by himself.  [C. M. Dep. at 104-05, 110-11, 113.]  C.M.'s deposition testimony seems to indicate that he submitted a written request to talk to the counselor on the morning of the day that he was moved to another room by himself, and according to C.M. it was in the afternoon of that day (during the 1:00 p.m. shift change) when his parents came to visit him.  [C.M. Dep. at 92-93, 98, 105.]  C.M.'s "sick call slip" (*i.e.*, his written request to see the counselor) exists but is undated.  [Ex. 13 to Doc. 55-14.]

C.M. subsequently gave a written statement indicating that he had reported L.H.'s sexual assaults to his parents during that visitation, but he testified at his deposition that he had no independent recollection of that portion of his statement.  [C.M. Dep. at 118-19.]

C.M. apparently prepared his written statement during the evening after he had spoken with the counselor and been placed in a different room by himself.  [C.M. Dep. at 113, 119.]

Plaintiff Linda Craig testified at her deposition that her visit with C.M. at the VCRJDC occurred during the morning of the day after C.M.'s court hearing.  She confirms that C.M. told her about L.H.'s sexual assaults during that visit.  [L. Craig Dep. at 54-58.] She also testified that she reported the problem to the guard who accompanied them during the visitation, as well as a nurse and a "JPO," or juvenile probation officer.  [L. Craig Dep. at 56, 58-61.]  According to this account, at least one member of the VCRJDC staff would have been notified of L.H.'s sexual assaults on C.M. by no later than 12:00 noon on the day after C.M.'s court appearance (*i.e.*, June 30, 2004).

Defendant Veronica Trujillo is the social worker or counselor at VCRJDC that C.M. references in his deposition testimony.  She authored a "progress note" acknowledging that C.M. reported to her that "he was having difficulties with his roommate," and "his roommate was making sexual advances towards him."  The progress note also indicates that Defendant Trujillo reported this information to "YPO2 and to Director," and that C.M. "was given another room."  [Ex. 9 to Doc. 55-10.]

Defendant Trujillo testified at her deposition that the entry on her "progress note" is dated June 30, 2004, and that she typically worked the 2:00 p.m. to 10:00 p.m. shift at the VCRJDC.  [Trujillo Dep. at 9, 29.]  Defendant Trujillo further testified that her contacts with the detainees at the VCRJDC generally consisted of an initial assessment plus any additional visits that were requested by the detainees by means of the written slips that they would turn

in to a mailbox located in their unit.  There was apparently no protocol, however, that specified how soon after a detainee's arrival Defendant Trujillo was to perform an initial assessment or how soon she would act upon the detainee's written requests.  In the case of C.M., Defendant Trujillo had not performed an initial assessment or acted upon a written request until after 2:00 p.m. (or 14:00 hours) on June 30, 2004.  [Trujillo Dep. at 11, 14-28.]

Further clues about the sequence of events on June 30, 2004, are contained in an "information report" that was authored by one or more YPOs who were not deposed in this matter.  The "information report" states that:  "During a special visit Client [C.M.] stated his roommate tried raping him.  I then asked him what had happened and he stated:  'Nothing, sir.  My roommate is weird.'"  [Ex. 12 to Doc. 55-13.]  The "information report" also reports a second incident occurring at approximately 6:00 p.m. on June 30, 2004, when the YPO "saw [C.M.] sitting on his bed and crying and Client [L.H.] pacing."  [Ex. 12 to Doc. 55-13.]  The report indicates that the YPO questioned both C.M. and L.H. at that time, and they responded by providing more details about L.H.'s sexual assaults and bullying.

Some aspects of the YPOs' "information report" are corroborated by the deposition testimony of the VCRJDC's Program Manager, Cookie Norris.   According to Ms. Norris, she received a page on June 30, 2004, from YPO Ernesto Valdez, who worked on the 2:00 p.m. to 10:00 p.m. shift at the VCRJDC.  Ms. Norris was not at the VCRJDC at the time of the page, but she returned YPO Valdez's call.  Upon hearing his report, Ms. Norris inquired whether C.M. had been referred to the social worker, Defendant  Trujillo, and YPO Valdez responded that C.M. was with the social worker in the computer room.  Ms. Norris then

instructed YPO Valdez that she did not want C.M. and L.H. to even engage each other visually, and that she wanted each of the two boys placed in a separate room by himself. [Norris Dep. at 57-62.] Ms. Norris further instructed YPO Valdez to keep the telephone line clear so that she could provide further direction after consulting with the VCRJDC's Director. [Norris Dep. at 65-66.] After her telephone conversaton with YPO Valdez, Ms. Norris reported the matter to the Director, as well as a probation officer and the State Police. [Norris Dep. at 61, 72.] Ms. Norris also requested that the "psych" doctors and other mental health staff at the BCJDC follow up with C.M. [Norris Dep. at 77.]

On the morning of July 1, 2004, C.M. was transported to the BCJDC, where he remained until his release from detention on July 16, 2004. During his first day at BCJDC, C.M. spent approximately one and one-half hours talking to a psychologist, who was aware of the reported incidents regarding L.H. During the remainder of his stay at BCJDC, C.M. received his medications twice a day and attended counseling or therapy sessions once a week without incident. [C.M. Dep. at 121-24.] His treatment continued after his release from BCJDC. [C.M. Dep. at 133.]

## II.   ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that

a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  <u>See</u> <u>id.</u> at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670-71 (10th Cir. 1998).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  <u>See</u> <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  <u>See</u> <u>id.</u> at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  <u>See</u> <u>id.</u>

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324; <u>Wright-Simmons v. City of Okla. City</u>, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To

survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991)). Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

In reviewing the exhibits, affidavits, and deposition testimony submitted by the parties to determine whether Defendants are entitled to summary judgment, the Court does not consider statements attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant witnessed. See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). The Court does, however, consider statements attributed to third parties when they are offered for other admissible purposes. For example, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar). They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements. See

generally <u>Echo Acceptance Corp. v. Household Retail Servs., Inc.</u>, 267 F.3d 1068, 1087

(10th Cir. 2001).  Such non-hearsay purposes are particularly relevant in a case such as this

one, where the reporting of a statement may take on legal significance apart from the truth

of the statement itself.

Apart from the limitations imposed by the Federal Rules of Evidence, it is not the

Court's role to weigh the evidence, assess the credibility of witnesses, or make factual

findings in ruling on a motion for summary judgment.  Rather, the Court assumes the

admissible evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all admissible evidence in the light most favorable to the non-

moving party, and draws all reasonable inferences in the non-moving party's favor.  <u>See</u>

<u>Hunt v. Cromartie</u>, 526 U.S. 541, 551-52 (1999).

### B.      **Plaintiff's Federal Claims Under 42 U.S.C. § 1983**

Plaintiff's *Complaint* [Doc. No. 1] asserts a cause of action under 42 U.S.C. § 1983.

This statute provides that:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.

Persons sued in their individual capacity under this civil-rights statute generally are

entitled to qualified immunity unless it is shown that their actions violated a specific federal

statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001).  The "salient question" is whether the state of the law at the time of the incident gave the individual defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

Persons also may be sued in their individual capacity under a theory of supervisory liability.  To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.  See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997); Holland, 268 F.3d at 1187.  In particular, a plaintiff must show that the supervisor acquiesced in the constitutional violation through "'personal participation," her "exercise of control or direction," or her "failure to supervise."  Id. (quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)).

In addition to being sued in their individual capacities under theories of personal or supervisory liability, county officials can be sued in their official capacity.  A suit under 42

U.S.C. § 1983 against a county official or employee in his or her official capacity, however, is treated as a suit against the county itself.  See Brandon v. Holt, 469 U.S. 464, 471-72 (1985); Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir.1988).

Counties can be held liable under 42 U.S.C. § 1983 only for their own unconstitutional or illegal policies, not for the tortious acts of their employees.  See Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1998).  In order to prevail on a claim under 42 U.S.C. § 1983 against a county or a county official sued in his or her official capacity, a plaintiff must prove (1) that a county employee committed a constitutional violation, and (2) that a county policy or custom was the "moving force" behind the constitutional deprivation.  See Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998).

When an official county policy itself violates federal law, "issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question."  Barney, 143 F.3d at 1307.  Proving the existence of such an official county policy also is relatively straightforward when that policy is expressly established by the county's authorized decisionmaker, i.e., the person "responsible for establishing final policy [for the county] with respect to the subject matter in question."  Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion).  "If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."  Id. at 481; see Lopez v. Lemaster, 172 F.3d 756, 763-64 (10th Cir. 1999).  A county also may be liable for constitutional deprivations "visited pursuant to

governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); see Pembaur, 475 U.S. at 481-82 n.10 (holding that the custom may be established by proof of knowledge and acquiescence).

Finally, a county's liability also can be established through a theory of inadequate training or supervision.  To prevail on such a theory, however, a plaintiff must show that the failure to train or supervise amounts to "'deliberate indifference.'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  Such deliberate indifference may be shown "'when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'"  Id. (quoting Barney, 143 F.3d at 1307).

Regardless of whether Plaintiff is proceeding on a theory of individual liability, supervisory liability, or municipal liability, her first task is to identify the specific federal constitutional rights which each Defendant is alleged to have violated.  42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989).  Thus, alleged violations of a state law or county policies regarding room assignments for juvenile pretrial detainees cannot, standing alone, form the basis for a claim under 42 U.S.C. § 1983. See Jones v. City & County of Denver, 854 F.2d 1206, 1209 (10th Cir.1988).

In this case, the only specific federal rights mentioned in Plaintiff's *Complaint* are those arising under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  In response to Defendants' motion for summary judgment, Plaintiff voluntarily abandoned her Fourth Amendment claim and acknowledged that her Eighth Amendment claim is subsumed by, or more properly stated as, a Fourteenth Amendment claim because C.M. was a pretrial detainee during the relevant time period.  [Doc. 55, at 15.]  It follows that all Defendants are entitled to summary judgment on Plaintiff's Fourth and Eighth Amendment claims, and the only federal claims which require further analysis are those arising under the Fourteenth Amendment's Due Process Clause.

Plaintiff asserts that the substantive component of the Fourteenth Amendment's Due Process Clause protects C.M.'s liberty interest in personal safety and well-being.  With respect to harms inflicted by private actors such as L.H., however, such protection is limited to instances where a state actor "'created the danger' that caused the harm," Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)), or where a state actor has entered into a "'special relationship' . . . to protect that individual from violent acts inflicted by others," Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1261 (10th Cir. 1998).  These limitations follow from our Supreme Court's determination that the Fourteenth Amendment's Due Process Clause "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196 (1989).

In this case, Plaintiff does not distinguish whether her substantive due-process claim is premised on a danger-creation theory or a special-relationship theory. The Tenth Circuit, however, has reasoned that the danger-creation theory must be reserved for "exceptional circumstances" involving an obvious or known risk of serious harm or else this theory would allow 42 U.S.C. § 1983 to "replace state tort law" and usurp the authority of "local policymaking bodies in making decisions impacting public safety." Ruiz v. McDonnell, 299 F.3d 1173, 1184 (10th Cir. 2002). Such exceptional circumstances are not present here, because at the time one or more Defendants took the affirmative act of assigning C.M. to share a room with L.H. at the VCRJDC, the evidence of record does not support a reasonable inference that the risk of L.H sexually assaulting C.M. was "obvious or known." Id. at 1182-83. Therefore, the danger-creation theory does not apply to this case.

I nevertheless consider Plaintiff's substantive due-process claim under the "special relationship" theory, which is premised on "'the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty.'" Armijo, 159 F.3d at 1261 (quoting DeShaney, 489 U.S. at 200). In the context of the juvenile pretrial detention at issue here, it is beyond dispute that the Defendants had a "special relationship" with C.M. during the time he was in their custody at the VCRJDC, the BCJDC, or in transport to or from these facilities. The mere existence of a special relationship, however, is not enough to establish liability under 42 U.S.C. § 1983.

Insofar as the special relationship arises from the pretrial detention of an individual charged with a criminal offense, courts generally apply a "deliberate indifference" standard in determining whether a state actor's failure to come to the aid of that individual amounts to a substantive due-process violation.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Barrie v. Grand County, Utah, 119 F.3d 862, 868-69 (10th Cir.1997).  This standard reflects our Supreme Court's determination that "[p]rison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  See Bell v. Wolfish, 441 U.S. 520, 547 (1979).  At the same time, the Due Process Clause shares the Eighth Amendment's requirement that jail officials "provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety."  Barney, 143 F.3d at 1310.

In the context of prison conditions, the Supreme Court and the Tenth Circuit have described the "deliberate indifference" requirement as involving both a subjective component and an objective component.  See Wilson v. Seiter, 501 U.S. 294, 298-99 (1991); Barney, 143 F.3d at 1310.  The severity and the duration of the alleged deprivation are relevant considerations with respect to both components.  See Barney, 143 F.3d at 1311-12.  Both the subjective and objective components of the "deliberate indifference" requirement must be satisfied in order to prevail on this type of claim.

The subjective component is satisfied only if the "'[prison] official knows of and disregards an excessive risk to inmate health and safety.'" Barney, 143 F.3d at 1310 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, a plaintiff alleging deliberate indifference to the risk of harm posed by another detainee must show (1) "actual knowledge of the specific risk of harm [to the plaintiff] ... or that the risk was so substantial or pervasive that knowledge can be inferred,"  (2) "fail[ure] to take reasonable measures to avert the harm,"  and (3) that "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended." Berry v. City of Muskogee, 900 F.2d 1489, 1498 (10th Cir.1990) (citations omitted).  "It is not enough to establish that the official should have known of the risk of harm." Barney, 143 F.3d at 1310.  Thus, the fact that the plaintiff is harmed by another pretrial detainee due to a state actor's negligence in monitoring that detainee will not establish the deliberate indifference needed to prevail on this type of Fourteenth Amendment claim.  See Riddle v. Mondragon, 83 F.3d 1197, 1203 (10th Cir. 1996).

The objective component of the "deliberate indifference" standard requires that the alleged deprivation or risk of harm be "sufficiently serious." See Wilson, 501 U.S. at 298. Absent a substantial risk of serious harm, "[t]he Constitution does not require 'a prison to station a full-time guard outside each cell to prevent' sexual assaults from occurring." Hill v. DeKalb Regional Youth Detention Ctr., 40 F.3d 1176, 1193 (11th Cir. 1994) (quoting Mooreman v Sargent, 991 F.2d 472, 474 (8th Cir. 1993)), abrogated in part on other grounds by Hope, 536 U.S. at 739 n.9.  Further, a need for medical treatment arising from such an

assault is not considered "sufficiently serious" unless the condition has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001); Hill, 40 F.3d at 1187.

Several courts have applied the "deliberate indifference" standard to substantive due-process claims by juvenile detainees, and thus there is clearly established law with respect to the application of that standard. See, e.g., Hill, 40 F.3d at 1185-86 n.19; Tribble v. Arkansas Dep't of Human Servs., 77 F.3d 268, 270 (8th Cir. 1996); A.M. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 579 (3rd Cir. 2004); Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001). Plaintiff cites one district court opinion, however, which employs a slightly different standard that our Supreme Court has applied to the involuntary commitment of a mentally disabled individual. See R.G. v. Koller, 415 F. Supp. 2d 1129, 1152-53 (D. Haw. 2006) (citing Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)).

While there does not appear to be clearly established law applying the Youngberg standard cited in R.G. to juvenile pretrial detainees, the Court will nevertheless consider that standard, along with the "deliberate indifference" standard, in determining whether Defendants violated C.M.'s substantive due-process rights. The Youngberg standard warrants some consideration here because the Tenth Circuit has applied that standard, rather than the "deliberate indifference" standard, to the situation of abused or neglected children in foster care. The rationale for doing so is that "foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals." Yvonne

L. v. N.M. Dep't of Human Servs., 959 F.2d 883, 894 (10th Cir. 1992) (quoting Youngberg, 457 U.S. at 321-22).  While the juvenile pretrial detainees at issue here may be charged with offenses that would be crimes if they were adults, they are still minor children.  Accordingly, the rationale articulated in Yvonne L. arguably has some bearing here.

In the context of applying the Youngberg standard to foster-care situations, the Tenth Circuit requires a plaintiff asserting a substantive due-process claim on behalf of a minor child to show (1) that the defendant "knew of the asserted danger to [the child] or failed to exercise professional judgment with respect thereto," Yvonne L., 959 F.2d at 890, (2) that there is "an affirmative link to the injuries [the child] suffered," id., and (3) that this "abdication of professional responsibility" is "sufficient to shock the conscience," Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1143 (10th Cir. 2006).

To determine whether there was evidence of an abdication of professional judgment, courts first must analyze whether a defendant was acting as a professional decisionmaker, i.e., a "person competent, whether by education, training or experience, to make the particular decision at issue."  Youngberg, 457 U.S. at 323 n.30.  In this context, action by a professional decisionmaker

> is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.  In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability.

Youngberg, 457 U.S. at 323; accord Holmes, 455 F.3d at 1144.

While a defendant's acts or omissions need not rise to the level of "deliberate indifference" in order to support a substantive due-process claim in the context of foster care, a "failure to exercise professional judgment" does not mean mere negligence in choosing among several professionally acceptable choices; rather, "it implies abdication of the duty to act professionally." Holmes, 455 F.3d at 1143. Even as applied to foster children, a standard of mere negligence is inappropriate because "a substantive due process violation must be more than an ordinary tort to be actionable under [42 U.S.C.] § 1983," Uhlrig, 64 F.3d at 573, and an exercise of professional judgment that is merely negligent cannot, as a matter of law, shock the conscience, see id. at 573-74.

In this case, Plaintiff claims that the Defendants exhibited deliberate indifference and departed from acceptable professional standards in two different ways. On the one hand, Plaintiff "challenges an episodic act or omission" of an individual Defendant or county employee, such as directing or allowing C.M. to return to the same room with L.H. after C.M. first reported that L.H. was assaulting him. See Lopez, 172 F.3d at 760. On the other hand, Plaintiff also alleges constitutionally inadequate conditions at the County Defendants' facilities which may have prevented individual Defendants or employees from recognizing or responding to the problem in a more timely manner. See id. In particular, Plaintiff challenges the following County policies or customs as constitutionally inadequate: (1) the procedure for intake screening, classification, and room assignment under which C.M. was assigned to share a room with L.H.; (2) the procedure for monitoring and supervising C.M.

and L.H. while they were sharing a room together during shift changes and sleeping periods; (3) the procedure by which a transport officer is to report and respond to a detainee's complaints; and (4) the availability and timeliness of the initial assessment and/or response to a detainee's complaints provided by a social worker or other mental-health care worker. [Doc. 55, at 17-18.]

To support the above claims, Plaintiff primarily relies on two published opinions addressing the constitutional rights of juveniles in detention facilities.  See A.M., 372 F. 3d at 579-88; R.G., 415 F. Supp. 2d at 1152-58.  As discussed in further detail below, the facts recited in each of these opinions are distinguishable from the case at bar.

A.M. involved a juvenile with a number of documented and previously diagnosed mental and behavioral disabilities who "was physically assaulted by other juvenile residents on numerous occasions" during the period of his detention at the Luzerne County Juvenile Detention Center between July 12, 1999, and August 19, 1999.  A.M., 372 F.3d at 575-76. Many of these assaults were documented in incident reports authored by child-care workers who witnessed them.  These incident reports supported a reasonable inference that "the child-care workers failed to intervene when altercations between A.M. and other residents began." Id. at 588.  Even worse, there was "evidence that suggests child-care workers would allow A.M. to get beaten up because they were sick of him and he deserved it."  Id.  These facts present a situation in which a substantial risk of serious harm to A.M. was so obvious that even a layperson would easily recognize the need for immediate attention.

R.G. involved a motion for preliminary injunctive relief on behalf of a group of juvenile detainees who were identified as, or perceived to be, lesbian, gay, bisexual, or transgender (LGBT). R.G., 415 F. Supp. 2d at 1133-34. The LGBT detainees complained of a "relentless campaign of harassment based on their sexual orientation that included threats of violence, physical and sexual assault, imposed social isolation, and near constant use of homophobic slurs." Id. at 1156. The LGBT detainees were subjected to this campaign over the course of several months of detention at the facility. See id. at 1136-37, 1142-45. Further, there was evidence that many incidents of harassment were reported to the staff at the detention facility without any responsive action. See id. at 1145-47.

In contrast to the lengthy and pervasive pattern of behavior at issue in R.G. and A.M., the assaults to which C.M. was subjected in the case at bar were perpetrated by a single individual in an episodic manner over the course of a few days. The evidence of record further indicates that there was less of a delay between the time that C.M. first complained about sharing a room with L.H. and the time that Defendants or their agents responded by separating the two boys and providing additional counseling to C.M. In these respects, the evidence of record in this case bears a closer resemblance to reported opinions in which state actors were found not to have violated a juvenile detainee's substantive due-process rights. See, e.g., Hill, 40 F.3d at 1185-95; Tribble, 77 F.3d at 270-71; Beers-Capitol, 256 F.3d at 135-41.

It is also noteworthy that the due-process claims at issue in R.G. and A.M. were supported by expert testimony identifying the both the applicable professional standards and

demonstrating the defendants' "failure to adopt *any* professional acceptable methods of maintaining order and safety" at their facilities. <u>R.G.</u>, 415 F. Supp. 2d at 1157-58; <u>see</u> <u>A.M.</u>, 372 F.3d at 581-84 (citing unrebutted expert testimony of the plaintiff's "corrections expert" and "psychiatric expert"). The <u>R.G.</u> opinion also repeatedly cites a report by the United States Department of Justice which "found 'it no exaggeration to describe [the juvenile detention facility] as existing in a state of chaos.'" <u>R.G.</u>, 415 F. Supp. 2d at 1132-33.

There is nothing of this sort in the case at bar. Indeed, Plaintiff has failed to proffer any expert witnesses who can identify the professional standards that apply to Defendants' facilities or how those standards were breached in this case. Plaintiff also has not presented admissible evidence to call into question the professional qualifications of Ms. Norris, Defendant Swisstack, or Defendant Trujillo.

While Plaintiff references state standards regarding the required size of sleeping rooms and the like [Ex. 10 to Doc. 55-11; Doc. 55 at 11 (citing "8.14.14.12(K) NMAC")], the only admissible testimony that is cited on this point relates to the size of the rooms at the BCJDC, not the VCRJDC where C.M. was housed with L.H. [Norris Dep. at 75.] Defendant Swisstack's deposition testimony indicates a preference for single-room occupancy as an "ideal standard," but also references "another standard" that allows for a percentage of double rooms. [Swisstack Dep. at 57, 58-61.] This evidence does not provide a reasonable basis for inferring that housing juvenile detainees two to a room amounts to a constitutional violation in the context presented here.

In any event, the undisputed evidence of record indicates that Defendants did, in fact, have procedures in place for screening and classifying detainees upon intake, making room assignments for them, monitoring and supervising the detainees while they were in their rooms together, and responding to complaints or grievances by detainees. Such procedures were checked and evaluated on an annual basis when the VCRJDC went through the certification process administered by the State's Children, Youth, and Families Department (CYFD). The VCRJDC obtained the required state certification every year during the period from 1997 to June of 2007. The BCJDC (on which the VCRJDC's procedures were modeled) also was certified by the American Correctional Association (ACA) every three years. [Swisstack Dep. at 6-10.]

In exercising their professional judgment regarding these procedures, the officials administering the juvenile detention facilities must consider the individual detainee's interest in personal safety together with several other important interests. With respect to shared room assignments, for example, Defendants also may need to consider the detainee's interest in avoiding unnecessary isolation. See, e.g., R.G., 415 F. Supp. 2d at 1155 (noting expert evidence indicating that "long-term segregation or isolation of youth is inherently punitive and is well outside the range of accepted professional practices"). With respect to monitoring the detainees inside their rooms, Defendants may need to consider the detainee's privacy interests (which may have precluded the use of cameras inside the rooms). With respect to handling grievances or complaints, Defendants may need to consider the

credibility and plausibility of a detainee's statements in order to ensure that other detainees are not punished based on false accusations.

When viewed in the light most favorable to Plaintiff, the evidence of record does not support a reasonable inference that Defendants' policies or customs in these areas fell outside the range of professionally acceptable choices or created a substantial risk of serious harm that was so obvious that even a layperson would recognize the need for immediate attention. In reaching this conclusion, I first consider the period of time between C.M.'s arrival at the facilities and his initial effort to report L.H.'s misconduct.

### 1.    The Time Period from C.M.'s Arrest Until his Conversation with the Transport Officer on June 29, 2004

At the time C.M. was assigned to share a room with L.H. in June 2004, he was of a similar age, stature, and classification as L.H., and Defendants had no knowledge of any past incidents or charges of sexual misconduct involving L.H.  Lacking such knowledge, it is not reasonable to infer that the risk of serious harm was so substantial as to require the VCRJDC to employ 24-hour camera surveillance inside the rooms or "'to station a full-time guard outside each cell to prevent' sexual assaults from occurring."  Hill, 40 F.3d at 1193 (quoting Mooreman, 991 F.2d at 474).

Similarly, the evidence of record does not support a reasonable inference that Defendants' policy or custom with respect to a social worker's duties in performing initial assessments or responding to written requests was the "moving force" behind a constitutional violation.  In this regard, the undisputed facts show that C.M. had several other avenues

available to him for reporting L.H.'s misconduct (including his parents, his counsel, his probation officer, the presiding judge, the YPOs, and the transport officer). C.M.'s own testimony indicates that he did not submit a written request to see the VCRJDC's social worker until the morning of the day when his parents visited and his room assignment was changed (*i.e.*, June 30, 2004). [C.M. Dep. at 92-93, 98, 105.]

Noting that C.M.'s written request is undated [Ex. 13 to Doc. 55-14], Plaintiff attempts to draw the inference that C.M. requested to see the social worker on the previous day (June 29, 2004), and that Defendant Trujillo wrote over that date when entering her "progress note" in order to cover up her failure to respond more promptly to C.M.'s request. Even when viewed in the light most favorable to the Plaintiff, the evidence of record does not provide reasonable support for such an inference.

Regardless of its date, the narrative portion of Defendant Trujillo's "progress note" indicates that C.M. was transferred to another room on the same date that she first spoke to him. If that date were June 29, 2004, instead of June 30, 2004, then Defendant Trujillo's "progress note" would have meant that C.M. was transferred to another room on the former date rather than the latter. Thus, attributing a date of June 29, 2004, to Defendant Trujillo's entry on the "progress note" does not support Plaintiff's theory of liability, and it is irreconcilably inconsistent with the other evidence of record and undisputed facts, including C.M.'s own testimony.

While the Court views the admissible evidence in the light most favorable to the non-movant at this juncture, the Court's ability to draw inferences from that evidence is limited

by the requirement that such inferences must be *reasonable*.  And in order to be reasonable, the inferences that the non-movant seeks to draw must find support in definite, competent evidence cited by the parties and made part of the record at time of completion of briefing on the motion for summary judgment.  See Anderson, 477 U.S. at 256-57; Adler, 144 F.3d at 670-71; Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).  The Court cannot manufacture grounds for denying a motion for summary judgment by piling inference upon inference without "solid, fact-specific footings."  Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1516 (1st Cir. 1989); see NLRB v. Meinholdt Mfg., Inc., 451 F.2d 737, 738 (10th Cir. 1971).

In order to support a reasonable inference, the evidence must be "significantly probative" and not "merely colorable."  Anderson, 477 U.S. at 249-50 (citations omitted). Merely positing a "plausible scenario" is not sufficient to "counter direct evidence offered in support of a motion for summary judgment."  Swanson v. Leggett & Platt, Inc., 154 F.3d 730, 733 (7th Cir. 1998).  Thus, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

In this case, the evidence of record does not support a reasonable inference that C.M. submitted a written request to speak with a counselor on June 29, 2004, or in fact spoke with Defendant Trujillo on that date.  Thus, there is no reasonable basis for concluding that

Defendant Trujillo, or any other named Defendant, was on notice of C.M.'s allegations or L.H.'s behavior before C.M. returned from his court appearance on that date.

### 2.  The Time Period from C.M.'s Conversation with the Transport Officer on June 29, 2004, Until his Visit with his Parents the Following Day

I next turn to the period of time between C.M.'s conversation with the transport officer on the afternoon of June 29, 2004, and his visit with his parents the following day. With respect to this period of time, the best inference that can *reasonably* be drawn in Plaintiff's favor is that, while being transported back to the VCRJDC from his court appearance on the afternoon of June 29, 2004, C.M. made a statement to Deputy Councilman to the effect that he was being "bullied" by his roommate and that he "felt as if [his] roommate was trying to rape [him]." [C.M. Dep. at 84-85, 112.] While Deputy Councilman did not recall this conversation at the time of his deposition, there is testimony from other witnesses indicating that the transporting deputy had a conversation with YPO Garcia while returning C.M. to the VCRJDC that afternoon, which prompted YPO Garcia to engage in a follow-up conversation with both C.M. and L.H.  During that follow-up conversation, C.M. declined to provide any details about the issue or pursue it further. [Garcia Aff. ¶¶ 4-6; C.M. Dep. at 85-88.]

To be sure, C.M.'s hesitation in reporting the details of L.H.'s misconduct or expanding on his initial statements is understandable given the evidence of L.H.'s threats, C.M.'s mental state at the time, or simply the embarrassing nature of the topic.  It is also

possible that Deputy Councilman and YPO Garcia could have handled the situation differently in order to identify the problem more promptly and accurately.

But the evidence of record does not support a reasonable inference that Deputy Councilman or YPO Garcia responded to C.M.'s initial allegation by "turn[ing] a blind eye to it" or refusing to investigate facts that they strongly suspected to be true. Ginest v. Board of County Comm'rs, 333 F. Supp. 2d 1190, 1198 (D. Wyo. 2004) (citing Farmer, 511 U.S. at 842). There is also no reasonable basis for inferring that the truth and scope of all of C.M.'s allegations were self-evident to the transport officer or to the VCRJDC staff at the moment C.M. made his first allegation. Rather, there was considerable uncertainty as to the depth and degree of this initial allegation.

Responding to such uncertainty by means of a follow-up conversation with a YPO, and deferring potentially punitive actions until the results of this follow-up conversation were known, falls within a range of presumptively valid professional judgment and does not evince deliberate indifference or a complete abdication of responsibility in this instance. As noted above, the investigative methods chosen by the Defendants and their employees to ascertain the truth and scope of C.M.'s initial allegation concerning L.H. had to account for their concomitant duties to respect the detainees' privacy, avoid unnecessary isolation, and ensure that detainees are not punished based on false accusations.

With respect to C.M.'s statements to the transport officer on June 29, 2004, the evidence of record also fails to support a reasonable inference that any of the County Defendants' policies or customs were the "moving force" behind a constitutional violation.

-33-

Regardless of whether Defendant Torrance County has a particular policy or custom with respect to reporting what a detainee says to a transport officer, the undisputed fact remains that Deputy Councilman had some conversation with YPO Garcia at the time C.M. was returning to the VCRJDC from his court appearance, and YPO Garcia then promptly questioned C.M. about his interactions with L.H.  By his own admission, C.M. did not detail what the issues were with respect to L.H. or pursue the matter any further during this conversation with the YPO.  [Garcia Aff. ¶¶ 4-10; C.M. Dep. at 85-88.]  Thus, the failure to resolve the problem during the afternoon of June 29, 2004, was due to the content of C.M.'s follow-up conversation with the YPO rather than the transport officer's failure to report the matter.  At that time, the truth and scope of C.M.'s allegations was not obvious or known to the transport officer or VCRJDC staff, because YPO Garcia's follow-up conversation with C.M. and L.H. did not corroborate or expand upon C.M.'s initial allegation to the transport officer.

### 3.    The Events of June 30, 2004

I next turn to the events of June 30, 2004.  There are several different accounts of how C.M.'s allegations of L.H.'s sexual assaults came to the attention of Defendants or their employees on that date.  C.M.'s testimony suggests that he submitted his written request to speak with a counselor on the morning of June 30, 2004, before he visited with his parents. It is not clear that Defendant Trujillo ever responded to C.M.'s written request before other VCRJDC staff intervened and brought the matter to her attention later in the day.

To be sure, if funding were available the better practice would have been for the VCRJDC to have a counselor on duty to answer C.M.'s request at the time it was submitted, rather than relying on a single employee whose working hours were limited by her part-time status. But with respect to a substantive due-process claim, liability cannot be premised on what Defendants *should* have done with respect to C.M.'s request to speak to a counselor. The question is what was *known by or obvious to* the Defendants as a result of this request. In this regard, the text of C.M.'s written request does not describe the nature of his complaint in any detail. [Ex. 13 to Doc. 55-14.] Thus, the submittal of this request, in and of itself, did not put Defendants on notice of the specific problems C.M. was experiencing with L.H.

The next significant event that occurred after C.M. submitted his written request to speak to a counselor was C.M.'s visit with his parents. According to Plaintiff, C.M. reported his allegations of sexual assault to her in the presence of one or more YPOs when she and her spouse visited C.M. at the VCRJDC on June 30, 2007. There is inconsistent testimony, however, as to the timing of that visit. According to Plaintiff, her visit with C.M. occurred during the late morning and would have concluded around 12:00 noon, when she went to give C.M.'s medications to the nurse. [L. Craig Dep. at 54-58.]

According to C.M., it was in the afternoon of that day (during the 1:00 p.m. shift change) when his parents came to visit him, and his visit occurred outside of the VCRJDC's usual visiting hours because of his father's medical needs. [C.M. Dep. at 92-93, 98, 105.] The "information report" and "progress note" attached as Exhibits 12 and 9 to Plaintiff's response brief [Doc. 55] appear to be consistent with such an afternoon visit, insofar as both

YPO Valdez and Defendant Trujillo worked on the afternoon shift.  According to YPO Valdez's "information report," C.M. made some allegations about L.H. during the visit with his parents, but the report then indicates that C.M. said, "Nothing, sir, my roommate is weird," when YPO Valdez asked him to elaborate on what happened.  [Ex. 12 to Doc. 55-13.]

Due to the inconsistencies in and between the testimony of C.M. and Plaintiff, the factfinder at trial could reject them as not credible in their entirety.  On a motion for summary judgment, however, the Court must view the evidence of record in the light most favorable to Plaintiff and attempt to piece together whatever reasonable inferences can be drawn from such inconsistent testimony.

As to the events of June 30, 2004, the best inference that can *reasonably* be drawn in Plaintiff's favor is that he reported the sexual assault allegations to his parents during a visit at the VCRJDC sometime during or near the afternoon shift change (from 1:00 p.m. to 2:00 p.m.), and that Defendants did not separate C.M. from L.H. and change their room assignments until during or after the next instance in which the two boys were in their room together.  Under one such scenario, Plaintiff's visit with C.M. may have occurred before the afternoon shift change, and then the boys were separated when, according to C.M.'s testimony, L.H. had him pinned against the wall during that afternoon shift change.  [C.M. Dep. at 88.]  Under this version of events, Defendant Trujillo's first visit with C.M. would have occurred soon after the afternoon shift change, at approximately 2:00 p.m. or 14:00 hours, as indicated on her "progress note."  [Ex. 9 to Doc. 55-10.]

A second and more likely variation of this scenario is that the visit between Plaintiff and C.M. occurred during the afternoon shift change (such that L.H. and C.M. were not placed in a room together during that shift change), and then the boys were separated around the time of the evening visitation for other detainees (*i.e.*, between 6:00 p.m. and 7:00 p.m.), when YPO Valdez heard C.M. crying or intervened in the incident where L.H. pinned C.M. against the wall.  This version of events finds support elsewhere in C.M.'s deposition testimony where he describes being "pinned against the wall" during the other detainees' visitation period from 6:00 p.m. to 7:00 p.m., [C.M. Dep. at 99] rather than during the afternoon shift change that he had earlier described.  [C.M. Dep. at 88.]  The inference that the YPOs intervened and separated the two boys during the other detainees' visitation period from 6:00 p.m. to 7:00 p.m. is further corroborated by the portion of the "information report" which references an observation that C.M. was heard crying in his room at approximately 6:00 p.m. on June 30, 2004.  [Ex. 12 to Doc. 55-13.]  This account also is consistent with C.M.'s deposition testimony that he was moved to a different room and spoke to a counselor on the evening of that date.  [C.M. Dep. at 104-05, 110-11, 113.]

The remaining legal question, then, is whether Defendants acted with deliberate indifference or abdicated their professional responsibility by failing to intervene and separate the two boys in between the time of Plaintiff's visit with C.M. and the next instance in which the two boys were in their room together (either the afternoon shift change or the evening visitation period for other detainees on June 30, 2004).  In answering this question, the Court first notes that the named Defendants in this action do *not* include any of the YPOs or other

-37-

county employees who actually received the information provided by C.M. or Plaintiff at the time of their visit on June 30, 2004 (*e.g.*, YPO Valdez, YPO Garcia, the nurse, or C.M.'s probation officer).  Accordingly, this Court lacks jurisdiction over these individuals and has no legal basis on which to hold them personally liable for their alleged failure to take immediate action in response to the information reported by Plaintiff or C.M. during their visit on June 30, 2004.  Cf. Lopez, 172 F.3d at 760 (noting that certain claims were undermined by the plaintiff's failure to identify the jailer as a defendant).

Further, Plaintiff has failed to amend her pleadings to substitute the names of any "John Doe" Defendants, and the deadlines for making such amendments and effecting service of process on the "John Doe" Defendants expired long ago.  For these reasons, Plaintiff's claims against the "John Doe" Defendants must be dismissed.  See Fed. R. Civ. P. 4(m); Petty v. County of Franklin, 478 F.3d 341, 345-46 (6th Cir. 2007).

With respect to Plaintiff's remaining federal claims, the County Defendants can be held liable under 42 U.S.C. § 1983 only for their own unconstitutional or illegal policies, not for the tortious acts of their employees.  See Barney, 143 F.3d at 1307.  Thus, even if the Court were to assume that a constitutional violation was committed by one or more of the county employees who received notice of C.M.'s allegations at the time of C.M.'s visit with Plaintiff on June 30, 2004, that assumption alone does not establish that the County Defendants' policies or customs were the "moving force" behind the employees' constitutional violation.  See Myers, 151 F.3d at 1316.

For the reasons previously stated (including the lack of any expert testimony proffered by Plaintiff on this subject), the evidence of record does not support a reasonable inference that a county policy or custom was the moving force behind the events which allowed C.M. to be placed in the same room with L.H. for a brief period on one occasion after C.M. had reported the assaults to his parents earlier that day on June 30, 2004.  Viewed in the light most favorable to Plaintiff, the evidence of record suggests that there was a delay of approximately four to five hours between the time of Plaintiff's visit with C.M. on June 30, 2004, and the time when the VCRJDC staff intervened to separate him from L.H.  The County Defendants had procedures in place for investigating the allegations that Plaintiff or C.M. reported during their June 30th visit, and the evidence that it took four to five hours for the investigation of these allegations to filter through the chain of command and result in some definitive action does not support a reasonable inference that such procedures were so deficient as to amount to a constitutional violation.

I next consider whether the evidence of record supports a reasonable inference that the failure to intervene during this four-to-five hour period on the afternoon of June 30, 2004, is attributable to any deliberate indifference or abdication of professional responsibility on the part of the individual Defendants in their personal or supervisory capacity.  In this regard, I note that the evidence of record contains no indication that Defendants Swisstack or Trujillo were present with C.M. when he made his accusations during his visit with his parents on June 30, 2004.  Defendant Swisstack was not even present at the VCRJDC that day, and by

the time he was informed of the events in question, the VCRJDC staff had already separated the two boys and moved C.M. to a different room.  [Norris Dep. at 57-74.]

While it is reasonable to infer that Defendant Trujillo was present at the VCRJDC beginning at approximately 2:00 p.m. (or 1400 hours) on June 30, 2004, the evidence of record does not support a reasonable inference that she met with C.M. during the interval between his visit with his parents and the next instance in which C.M. and L.H. were in their room together, or that the information C.M. had previously reported to his parents was conveyed to Defendant Trujillo during this interval.  C.M.'s own testimony, for example, seems to indicate that he met with a counselor (presumably Defendant Trujillo) for about thirty minutes in the evening on June 30, 2004.  At two points in his deposition, C.M. testified that he had already been moved to a room by himself before meeting with the counselor [C.M. Dep. at 104-05, 113].  At another point he testified that he was put into a different room after meeting with the counselor.  [C.M. Dep. at 110-11.]

Neither version of C.M.'s testimony supports a reasonable inference that he was placed back in the same room with L.H. after his meeting with Defendant Trujillo.  Thus, the evidence of record provides no reasonable basis for concluding that Defendant Trujillo allowed or directed C.M. to be placed back in the same room with L.H. after she came to know about the sexual assaults (either through meeting with C.M. or through information conveyed by other staff members).  Without admissible evidence that the specific nature and extent of C.M.'s allegations were known or obvious to Defendant Trujillo before the last instance in which C.M. was placed in the same room with L.H., Defendant Trujillo's liability

-40-

would have to be premised on the notion that, regardless of what she actually knew, she *should* have been more prompt in performing her initial assessment or responding to C.M.'s written request.

While the Court expresses no opinion on whether a defendant's unknowing delay in performing these actions amounted to negligence under state law, such delay does not amount to the kind of deliberate indifference or complete abdication of professional responsibility necessary to prevail on a substantive due-process claim under 42 U.S.C. § 1983.  Having failed to establish a genuine issue of material fact as to whether the individual Defendants' conduct amounted to a constitutional violation, it follows that Plaintiff also cannot meet her burden of showing the existence of clearly established law that would preclude the defense of qualified immunity as to these Defendants.  Accordingly, Defendants Trujillo and Swisstack are entitled to summary judgment on Plaintiff's substantive due-process claim.

### 4.    The Time Period from C.M.'s Placement in a Different Room Until his Release from Defendants' Facilities

Finally, I consider whether 42 U.S.C. § 1983 provides any basis for imposing liability on Defendants for their treatment of C.M. between the time he was separated from L.H. on June 30, 2004, and his release from Defendants' facilities the following month.  It is undisputed that C.M. was not subjected to any further attacks by L.H. or other detainees during this period of time; however, Plaintiff questions the quality of counseling or other follow-up care that he received from Defendants in response to the previous attacks.

With respect to this period of time beginning when C.M. was separated from L.H. and their room assignments were changed on June 30, 2004, Plaintiff has not come forward with admissible evidence to support the objective component of the "deliberate indifference" test. Under this component of a substantive due-process claim, "the deprivation alleged must be, objectively, sufficiently serious," meaning that the "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 824 (citations and internal quotation marks omitted).  Thus, "[d]elay in medical care only constitutes [a constitutional] violation where the plaintiff can show that the delay resulted in substantial harm."  Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000).  The paradigmatic example of such harm would be that resulting from a heart attack or similar condition requiring emergency medical care.  See id.

In this case, there is no evidence that L.H.'s attacks on C.M. resulted in any skin-to-skin contact with C.M.'s private areas or produced any lasting physical injuries. Nevertheless, Plaintiff asserts that one of C.M.'s health-care providers told him that he suffered some form of post-traumatic stress disorder (PTSD) in response to L.H.'s attacks at the VCRJDC.  [C.M. Dep. at 132-33; L. Craig Dep. at 69-71.]

This assertion is inadmissible hearsay and is unsupported by any expert testimony from a qualified witness.  The only psychological report that appears in the record opines that C.M. does not suffer from PTSD as a result of L.H.'s attacks and that PTSD is not an appropriate diagnosis.  [Ex. D to Doc. 51-2.]  While this report also does not appear in an admissible format, the fact remains that Plaintiff has not presented evidence that L.H.'s

attacks at the VCRJDC caused C.M. to develop a serious and lasting medical or psychological condition that remained untreated while he was in the Defendants' custody.

The evidence of record also does not support a reasonable inference that Defendants denied care for any ongoing medical or psychological conditions for which C.M. did seek treatment.  In addition to the counseling he received with Defendant Trujillo around the time he was moved to a different room at the VCRJDC on June 30, 2004, C.M. acknowledges in his deposition testimony that he spent approximately one and one-half hours talking to a psychologist after being transported to the BCJDC the following day, and that he received his medications twice a day and attended counseling or therapy sessions once a week without incident during the remainder of his stay there.  [C.M. Dep. at 121-24.]  His treatment also continued after his release from BCJDC.  [C.M. Dep. at 133.]  This evidence does not provide reasonable support for a claim that Defendants somehow acted with deliberate indifference or abdicated their professional responsibility with respect to the care they provided to C.M. after he was separated from L.H.

Finally, Plaintiff has failed to articulate any legal grounds on which to premise a claim that his constitutional rights under the substantive component of the Due Process Clause entailed some obligation on the part of Defendants to more vigorously pursue some form of criminal prosecution or disciplinary action against L.H. for the attacks he perpetrated.  See generally Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976) (discussing principles of prosecutorial immunity).  For all of the foregoing reasons, Defendants are entitled to summary judgment on each of Plaintiff's federal claims.

### C.    **Plaintiff's State-Law Claims**

Defendants also move for summary judgment on Plaintiff's claims that they were negligent and may be held liable for such negligence under the New Mexico Tort Claims Act.  Because these remaining claims arise under state law, and there is no allegation or evidence that the parties' citizenship is diverse, such claims are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).  "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Having granted summary judgment  in Defendants' favor on all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  The duties and policies which are the subject of Plaintiff's negligence claims, as well as the principles for determining whether state actors have waived sovereign immunity with respect to those claims,  are creatures of state and local law best suited to adjudication in a state court.  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher

Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).  In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claims against the Defendants who have been named and served in this action, as federal law provides that these claims are to be remanded to the state court in which this action originated.  See 28 U.S.C. §§ 1441(c), 1447(c).

## III.   CONCLUSION

For the foregoing reasons, I conclude that each Defendant is entitled to summary judgment with respect to all of Plaintiff's federal claims.  This Court declines to exercise supplemental jurisdiction over Plaintiff's negligence claims, which arise under state law. Accordingly, the negligence claims which remain in this action are remanded to the Second Judicial District Court for the County of Bernalillo, State of New Mexico.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 50] is **GRANTED IN PART** with respect to all of Plaintiff's federal claims against each Defendant, and those claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. 50] is **DENIED IN PART** with respect to Plaintiff's negligence claims under state law based on this Court's decision not to exercise supplemental jurisdiction over those claims.

**IT IS FURTHER ORDERED** that this action is **REMANDED** to the Second Judicial District Court for the County of Bernalillo, State of New Mexico, pursuant to 28 U.S.C. §§ 1441(c), 1447(c).

**SO ORDERED** this 10th day of January, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge